## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHARLES REAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-03794-TWP-MG |
| | ) | |
| CHOSEN CONSULTING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment (Filing No. 32) filed by Defendant Chosen Consulting, LLC ("Chosen Healthcare"). Plaintiff Charles Reagan ("Reagan") initiated this action against Chosen Healthcare alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Filing No. 1 at 3). Chosen Healthcare has moved the Court for summary judgment on this claim, arguing that it terminated Reagan's employment for legitimate, nondiscriminatory reasons, namely that he engaged in abuse against multiple residents (Filing No. 32; Filing No. 33).  For the following reasons, the Court **denies** the Motion.

### I.        BACKGROUND

The following facts are not necessarily objectively true; the Court, as required by Federal Rule of Civil Procedure 56, presents them in the light most favorable to Reagan as the non-moving party. *See Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Reagan, who is male, first worked for Chosen Healthcare from 1996 through 1999.  He was rehired in June 2017 to serve as a Certified Nursing Assistant ("CNA") in its Essex Nursing

and Rehabilitation facility in Lebanon, Indiana ("Essex") (Filing No. 36-7 at 1). He had previously

worked as a CNA at this location. His job description required, among other things, that he must

1. "work well with residents and staff",

2. "accept supervision and constructive criticism",

3. "possess the ability and willingness to deal tactfully with staff, residents, family members, visitors, government agencies/personnel and the general public",

4. "possess the ability and willingness to work harmoniously with other personnel",

5. "have patience, tact, a cheerful disposition and enthusiasm, as well as the willingness to handle difficult residents based on whatever cognitive level they are currently functioning",

6. "not pose a direct threat to the health or safety of other individuals in the workplace", and

7. "cope with the mental and emotional stress of the position".

(Filing No. 33-2 at 1–2). On top of his general duties, Reagan was specifically used as the primary

enforcer of the facility's tobacco and alcohol policies, often requiring him to confiscate cigarettes

and alcohol from residents (Filing No. 36-1 at 3–4, 12). The role of "male authority figure" made

Reagan feel at times that he was "targeted" by some aggrieved residents because of his gender. *Id.*

No women were tasked with this job, and he believes he was picked for the duty because of his

"deep, stern" voice. *Id.* at 4, 10, 11. As a result of being used "as a cop," Reagan made a complaint

of gender discrimination to the former Administrator at Essex, Roger Brannan ("Brannan"), in

September or October 2017 (Filing No. 36-26 at 6; Filing No. 36-1 at 7).

Reagan was also required to comply with Chosen Healthcare's Resident Abuse and Neglect

Policy ("Abuse Policy"), which recognized that "each resident has the right to be free from abuse,

neglect, and misappropriation of resident property." (Filing No. 33-3 at 1.) Under the Abuse Policy,

abuse included that which was "verbal," "sexual," "physical," and "mental." *Id.* at 1–2. The Abuse

Policy stated that "if the alleged violation is substantiated, appropriate corrective action will be taken." *Id.* at 4. While the Abuse Policy is silent as to next steps if abuse cannot be substantiated beyond a resident report, *see id.*, abuse in any of the above-listed varieties was "STRICTLY PROHIBITED" and would result in suspension, investigation, and "possible termination." (Filing No. 33-4 at 1.) Reagan acknowledged receipt of the Abuse Policy on June 19, 2017 (Filing No. 33-5 at 1), and understood that resident abuse could lead to termination (Filing No. 33-1 at 4, 5).

Exactly one year later, Reagan received his annual Employee Performance Review, where his supervisor Deborah Thomas ("Thomas") indicated that he was "excellent" (the highest rating) in five of six categories: (1) "Job Knowledge," (2) "Work Quality," (3) "Attendance/Punctuality," (4) "Initiative," and (5) "Dependability." (Filing No. 36-18 at 1.) In the final category— "Communication/Listening Skills"—Thomas marked his performance as "Good" (the second highest rating), indicating that his "[m]ale voice can sometimes be taken as yelling/arguing when not." *Id.* Reagan received a total score of 29 out of 30 points, and Thomas thanked him "for all [his] help." *Id.* Following this review, Reagan received a pay raise of 3%; approximately six months earlier, he had received a 13% pay raise because of a "new pay scale." *Id.* at 2–3.

From September 9, 2018 to September 14, 2018, the Indiana State Board of Health ("Board") conducted a recertification and licensee survey at Essex (Filing No. 33-20 at 1). This process included an audit involving a resident interview component, which itself included asking residents whether they had been abused at Essex. *Id.* During these interviews, three residents made four abuse allegations against Reagan—who had previously never been disciplined by Chosen Healthcare for any policy violation (Filing No. 36-7 at 2). These abuse allegations resulted in his immediate suspension and an investigation into the accusations (Filing No. 33-20 at 2). Brannan noted in an email that "[t]he allegations being made to surveyors are from smokers who

3

have had their privileges reduced," and "the smokers are out to get [Reagan] because they don't like him." (Filing No. 36-6 at 1; *see also* Filing No. 36-7 at 2 ("Each resident that filed an allegation of abuse against me did not like me due to enforcing Chosen[ Healthcare]'s smoking policy and/or some other reason.").)

Specifically, one complaint indicated that Reagan told a resident "I could do something to you that you would never forget." (Filing No. 33-6 at 1, 4.) Another complaint from this resident expressed that Reagan "scares" the resident (Filing No. 33-8 at 1). This resident—a smoker who had called Reagan a "prick" and a "Brutus transvestite" for administering the tobacco rules (Filing No. 36-1 at 11)—suffers from schizophrenia and bipolar disease (Filing No. 36-5 at 1). Reagan believed that this resident "doesn't like any males." (Filing No. 36-1 at 11.)

A different resident complained that Reagan had been "throwing [the resident] around." (Filing No. 33-7 at 1.) This resident, also a smoker ostensibly unhappy with Reagan's enforcement of tobacco regulations (Filing No. 36-1 at 12; Filing No. 36-6 at 1), suffers from Parkinson's disease and dementia (Filing No. 36-8 at 1). When this incident was reported to Licensed Practical Nurse Teresa Cain ("LPN Cain"), a Board surveyor saw LPN Cain "roll her eyes," noting that this resident frequently made "false claims" against workers. *Id.* Because she "knew" these allegations were false, and she found no marks on the resident, LPN Cain indicated that she "would not report [the] accusation." *Id.* Later, though Thomas indicated that she would need to "re-educate" LPN Cain because all allegations of abuse should be reported, LPN Cain still received a score of 28 out of 30 points and a 3% pay raise following her next annual review. *Id.*; Filing No. 36-21 at 1.

Finally, another resident's complaint specified that Reagan "came into [a resident's] room a few weeks ago and insisted that the door stay open. He was also rude to her." (Filing No. 33-9 at 1.) But according to Reagan, this resident, another agitated smoker (*see* Filing No. 36-6 at 1), also

did not like him because he kept "waking her up" at mealtimes (Filing No. 36-1 at 10). Thomas, for her part, shared with Board surveyors that she had spoken with Reagan "a couple of times in the past for talking in a loud voice to residents." (Filing No. 36-3 at 5.)

As part of its investigation, Chosen Healthcare interviewed both Reagan (who consistently denied the allegations) and the residents accusing him of abuse (Filing No. 33-20 at 2; Filing No. 36-7 at 2). But because no other individuals witnessed the alleged events, Chosen Healthcare ascertained that it could not entirely and independently "substantiate" the four abuse allegations (Filing No. 33-20 at 2). As Reagan recognizes, because these instances of abuse were "unsubstantiated," they were essentially "just a he-said-he-said or she-said situation." (Filing No. 33-1 at 26.) According to Reagan, these false reports and situations are not rare, and CNAs are daily accused of abuse (Filing No. 36-1 at 19). Reagan acknowledges that "[i]f [residents] made those reports [against him], then they made those reports. I'm not [going to] say they didn't make those reports." (Filing No. 33-1 at 17.)

Following the investigation (which Reagan doubts actually transpired (*see* Filing No. 33-1 at 16)), Brannan suggested ending Reagan's employment, noting that a Board surveyor "want[ed] a decision on him" the next day (Filing No. 36-13 at 2). Leadership at Chosen Healthcare—former Regional Operations Director Randy Hornstein ("Hornstein"), Vice President of Clinical Laura Mace ("Mace"), and former Human Resources Director Wendy Schippers ("Schippers")—agreed with the recommendation and decided to terminate Reagan. (Filing No. 33-11 at 1, 2). In a separate email to these leaders, Brannan stated that Reagan "has always had a cocky mouth." (Filing No. 36-19 at 1.) Reagan does not know Mace or Schippers (Filing No. 33-1 at 22), he does not assert that Hornstein (nor Mace or Schippers, for that matter) ever demonstrated hostility toward individuals because of their gender (Filing No. 33-10 at 2).

On September 13, 2018, Brannan informed Reagan that his employment was terminated because of the alleged abuse, but would not provide details concerning the reported incidents (Filing No. 33-1 at 13–14).  Later, Brannan indicated in emails that he terminated Reagan, that "[s]urveyors wanted [Reagan] fired," and that the "[a]llegations could not be substantiated." (Filing No. 36-13 at 3, 7.) Another employee, however, stated in an email that Reagan was let "go as a result of substantiated resident abuse." *Id.* at 6. In Reagan's view, though, the termination decision was driven by two coworkers with no supervisory power over him who controlled the "passive" Brannan and who did not like Reagan because he was a man (but who, Reagan admits, tried to drive "pretty much" everybody—including women—out of Essex) (Filing No. 36-1 at 3–5, 7).[1]

Meanwhile, the only other CNA at Essex terminated for resident abuse from January 1, 2015 to November 1, 2019, was Merce Hale ("CNA Hale"), who is incidentally Reagan's mother (Filing No. 33-12 at 2; Filing 36-7 at 1). Before her termination, two initial abuse allegations were received by Chosen Healthcare about CNA Hale.  First, the brother-in-law of a resident reported that the resident's arm had a pink spot, which the resident had indicated was made by "the skinny lady," who was assumed to be CNA Hale, on July 8, 2018 (Filing No. 33-15 at 1, 2). CNA Hale was immediately suspended, and though it was initially alleged that the pink spot was created by CNA Hale grabbing the resident's arm during a shower, follow-up investigation of the matter resulted in a conclusion that abuse did not occur: (1) the resident frequently obtained a red spot on his arm at that location from his wheelchair, (2) CNA Hale denied ever giving the resident a shower, (3) the resident was found to be an "unreliable historian," (4) the resident's daughter indicated that her aunt and uncle were "crazy," that she had "trouble" with them at the "last facility

---

[1] In his response brief, Reagan relied upon statements he made during his deposition that were relayed to him by a third party that were reportedly said by these coworkers and Brannan. But these statements are clearly double hearsay not to be considered on summary judgment. *See Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n.3 (7th Cir. 2021) ("Inadmissible hearsay evidence may not be considered on summary judgment.") (citations omitted).

resident lived," and that they were trying to get CNA Hale fired, (5) and the resident's sister and brother-in-law did not believe abuse occurred.  *Id.* at 2.  Second, during another Board audit (*see* Filing No. 36-16 at 3), a fellow CNA reported that she overheard CNA Hale "tell resident to take her shower now or she is not getting one" four months later on November 8, 2018 (Filing No. 33-16 at 1).  CNA Hale was again immediately suspended, and an investigation found that the allegation "could not be substantiated" and there were "no concerns" expressed about CNA Hale by staff or residents.  Brannan determined that CNA Hale needed to be "re-educated on speaking appropriately to residents."  *Id.* at 2.  After reviewing the Abuse Policy with CNA Hale, and her successful completion of a "post test," Brannan returned CNA Hale to work with a written disciplinary reprimand four days later on November 12, 2018.  *Id.*  Ultimately, CNA Hale was terminated on May 30, 2019, after a cook reported that she overheard CNA Hale threaten to slap a resident after he put his soiled hands near his mouth (Filing No. 33-13 at 1; Filing No. 50 at 1).

CNA Hale, along with Reagan's wife Dara Reagan (who was also employed by Chosen Healthcare as a CNA) ("CNA Dara"), later stated that another female employee at Essex—Registered Nurse Toinette Mooday ("RN Mooday")—after a yelling match with a resident escalated to a call to police, was not terminated.  Instead,  RN Mooday "was allowed to leave Chosen [Healthcare] for another employer, which she found within a couple of days." (Filing No. 36-15 at 2; Filing No. 36-25 at 1–2.)  CNA Dara, however, also indicated that a different woman employed at Essex—Licensed Practical Nurse Sheila Hilker ("LPN Hilker")—"was terminated by Chosen" Healthcare after she and a resident "fought over a pitcher of tea" in July 2020 (Filing No. 36-25 at 2).  Though the incident occurred on a Saturday, LPN Hilker "was allowed to continue working until the following Monday, when a complaint for abuse was finally submitted and she was suspended."  *Id.*  Though CNA Dara indicates LPN Hilker was terminated, she also states that

she "was not disciplined for abuse to the best of my knowledge." *Id.* Finally, during yet another Board audit (this time in August 2019), the Essex facility was found to have failed to follow several protocols, which Reagan characterizes would each constitute instances of abuse (*see* Filing No. 24 *passim*).

Eventually, Reagan filed a complaint against Chosen Healthcare on September 6, 2019, alleging gender discrimination under Title VII (Filing No. 1 at 3). On September 8, 2020, Chosen Healthcare moved for summary judgment (Filing No. 32).

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to

relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.    DISCUSSION

Though Chosen Healthcare contends that Reagan has provided no direct evidence of gender discrimination (Filing No. 33 at 8–9), the Court need not delve into that argument because Reagan proceeds solely under the "indirect method." (*See* Filing No. 35 at 20.) "In discrimination cases, '[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (citing *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir.), *reh'g denied* (July 31, 2020)). "One way of proving employment discrimination under Title VII remains the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 . . . (1973)," which "requires a plaintiff to make a prima facie case of discrimination"—that is, that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Id.* (citing *Marshall v. Indiana Dep't*

9

*of Correction*, 973 F.3d 789, 791–92 (7th Cir. 2020)). Once this prima facie case is made, "'the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext.'" *Id.* (quoting *Purtue*, 963 F.3d at 601–02).

Moreover, "a plaintiff need not use the *McDonell* [sic] *Douglas* framework after *Ortiz* [*v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)]," which instructs that "[t]he determinative question in discrimination cases is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki*, 988 F.3d at 957–58 (citing *Ortiz*, 834 F.3d at 765). But here, the parties argue the case under *McDonnell Douglas*, so the Court will analyze under that framework.

## A.  <u>Prima facie case under *McDonnell Douglas*</u>

Chosen Healthcare concedes *McDonnell Douglas*'s first and third prongs—that Reagan is a member of a protected class and that he suffered an adverse employment action (Filing No. 33 at 9–10).[2] According to Chosen Healthcare, Reagan can neither prove that "he was meeting Chosen Healthcare's legitimate expectations" nor that "he was treated less favorably than similarly situated individuals outside his protected class". *Id.* at 10.  Chosen Healthcare argues that Reagan did not meet its expectations because "he engaged in inappropriate, prohibited conduct towards residents."

---

[2] That said, Chosen Healthcare contends that Reagan "faces a major hurdle as he is a male plaintiff alleging gender discrimination." (Filing No. 33 at 8 (citing *Katerinos v. United States Department of the Treasury*, 368 F.3d 733,736 (7th Cir. 2004); *Phelan v. City of Chi.*, 347 F.3d 679, 684 (7th Cir. 2003)). True, a male plaintiff alleging gender discrimination ordinarily "must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [males] or evidence that there is something fishy about the facts at hand*." Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003). But Chosen Healthcare has decided to concede this element, relieving Reagan of this burden (*see* Filing No. 33 at 9–10; *but see* Filing No. 35 at 20 n.22 (arguing that "Reagan is a male in a female dominated field, the majority of the decision makers were female, no other employee had a performance review note their male/female character traits in order to dock them points, and Chosen departed from their procedures policies in an unprecedented way in disciplining female employees").

*Id.* They also contend Reagan "cannot point to a single comparator who received better treatment by Chosen Healthcare." *Id.* They point out that the only other Essex CNA also terminated for resident abuse during the relevant time was a woman, CNA Hale. *Id.*

As for any contention that CNA Hale was treated more favorably because she was not terminated until the third allegation against her, the first two complaints "came to different conclusions, and thus had mitigating circumstances that would distinguish Chosen Healthcare's treatment of them." *Id.* at 10–11. The first complaint, for instance, was found to not even have occurred. *Id.* at 11. And the second allegation revealed "no concerns" about CNA Hale; even so, she was counseled, given a written warning, and suspended for four days, demonstrating that she too faced punishment for her actions. *Id.* In contrast, four complaints involving allegations of physical and verbal abuse were made against Reagan. *Id.*

Reagan responds that he was meeting Chosen Healthcare's "legitimate expectation" and "was not on any level of discipline". (Filing No. 35 at 20.) He argues that he was treated less favorably than women at Essex. Specifically, CNA Hale (again, his mother) "was able to return to work after both a substantiated and unsubstantiated allegation", whereas "[e]very complaint against Reagan was unsubstantiated but he was not permitted to return to work". *Id.* at 22. In short, though "multiple other employees discredited the complaints against Reagan[,]… for some reason Reagan's [alleged conduct] warranted termination where Hale's warranted a 'suspension.'" *Id.* at 23. Additionally, LPN Cain's "failure to not only report allegations of abuse under Chosen [Healthcare]'s policy but also her failure to adhere to Indiana statute would warrant termination." *Id.* Reagan asserts that Chosen Healthcare "refused to discipline her following her failure to report allegations of abuse." *Id.* at 24. He argues "it is fairly obvious" that LPN Cain "received better treatment" when she was simply "re-educated." *Id.* Finally, "[i]t is not unreasonable to infer from"

Board audits that Chosen Healthcare "allows female employees accused of abuse to be disciplined under a different term (i.e. inappropriate workplace behavior)." *Id.* at 25.

Chosen Healthcare replies that Reagan "has shown no comparator who was treated more favorably than him." (Filing No. 44 at 15.) First, "the undisputed evidence shows Chosen Healthcare also terminated a female employee for resident abuse." *Id.* "To the extent that [Reagan] argues [CNA] Hale was treated more favorably because she was not terminated when there were two prior abuse allegations against her," Chosen Healthcare explains that Reagan "fails to address that those allegations had mitigating circumstances that would distinguish Chosen Healthcare's treatment of them." *Id.* Specifically, complaints against CNA Hale took place over two years; "three abuse accusations were made against [CNA] Hale over a two-year period, as opposed to four abuse complaints made against [Reagan] at the same time." *Id.* As for CNA Hale receiving preferential treatment after the first allegation against her, Chosen Healthcare notes that it could conclusively determine that abuse did not occur because CNA Hale "was not even working when" the abuse was claimed to have occurred. *Id.* (citing Filing No. 33-15).[3]

Considering the second allegation, Reagan argues "the resident himself," along with "other residents and staff," had no concerns about CNA Hale. *Id.* at 16. Even so, CNA Hale still received corrective action. *Id.* Alleged abuse at the hands of Reagan, on the other hand, could not be substantiated merely because "none of the alleged abuse incidents were witnessed." *Id.* And contrary to Chosen Healthcare's contentions, "[t]he Abuse Policy does not dictate what action must be taken if an alleged violation cannot be substantiated beyond the residents' own statements, nor does it prohibit discipline or termination for such violations." *Id.* Reagan's divergent "tortured"

---

[3] Though Chosen Healthcare claims that this exhibit demonstrates that Chosen Healthcare "could definitively confirm" at the time that CNA Hale "was not even working" when the alleged abuse occurred (Filing No. 44 at 15), this incident report merely states that Chosen Healthcare had determined that the resident's shower "was not given by" CNA Hale, and that CNA Hale had "indicated that she had never given [the resident] a shower." (Filing No. 33-15 at 2.)

reading of the Abuse Policy is "nonsensical" because it would foreclose discipline not witnessed by others "in an environment where many resident abuse interactions are one-on-one." *Id.*

Chosen Healthcare asserts that [RN] Mooday, [LPN] Hilker, and [LPN] Cain, who Reagan alleges were treated more favorably than him, are not proper comparators because they were not subject to the same decisionmakers as him. *Id.* at 17. Even putting aside the fact that (1) the allegation concerning RN Mooday is only supported by "the self-serving allegations in the affidavits of [Reagan's] mother (Mercy Hale) and wife (Dara Reagan)" and (2) there are no details about "whether the potential abuse was reported to Chosen Healthcare's management and whether management concluded abuse occurred." *Id.* Reagan, they argue, has not shown that RN Mooday was subject to his decisionmaker, and he cannot: "Schippers and [ ] Hornstein were no longer employed at Chosen Healthcare in July 2019, and [ ] Mace was not involved in any decision on whether to take corrective action against [RN] Mooday." *Id.* As for LPN Hilker, allegations concerning her are also missing important details—Reagan "fails to identify the 'Administrator' who allegedly decided to not discipline Hilker," for example—and "Schippers and [ ]Hornstein were no longer employed at Chosen Healthcare in 2020, and [ ] Mace was not involved in any decision on whether to take corrective action against [LPN] Hilker." *Id.* at 18. Concerning LPN Cain, Reagan's "decision makers were not involved in the decision to discipline [LPN] Cain for her failure to report resident abuse." *Id.*

The Court finds that Reagan's claim may proceed because he has provided sufficient evidence to establish a prima facie case of discrimination. Reagan has demonstrated that he was meeting Chosen Healthcare's legitimate expectations: before these allegations of abuse against him, Reagan had never faced discipline from Chosen Healthcare for any policy violation or

allegation of resident abuse and had received positive annual evaluations and several recent pay increases (*see* Filing No. 36-7 at 2; Filing No. 36-18 at 1–3).

As for the more-contested, fourth element under *McDonnell Douglas*, Reagan has identified a better treated, similarly situated comparator.  Ordinarily, "a plaintiff who believes another individual is similarly situated must at least show that this comparator (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (quotations omitted). "Comparators must have engaged in similar—not identical—conduct to qualify as similarly situated." *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012) (quotation omitted). "To determine whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Id.* at 851 (quotation omitted). "While similarly situated parties need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quotation omitted).

Here, no one disputes that Reagan and the female CNA Hale shared a supervisor (Thomas), and set of standards. Chosen Healthcare places too fine a point on distinguishing between the conduct of Reagan and CNA Hale, who, at least at the summary judgment stage, suffices to serve as a suitable comparator. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021) (noting that "a plaintiff typically needs only one comparator to avoid summary judgment or judgment as a matter of law") (citation omitted).  The allegations against both—resident abuse— if proven true, would demonstrate that they both "engaged in conduct of comparable seriousness." *Coleman*, 667 F.3d at 851.  Especially relevant here is Chosen Healthcare's treatment of CNA Hale

after a fellow CNA reported that she overheard CNA Hale "tell resident to take her shower now or she is not getting one." (Filing No. 33-16 at 1.) Though an investigation found that the allegation "could not be substantiated" and there were "no concerns" later expressed about CNA Hale by staff or residents, the accusation was indeed relayed by another employee—not merely a "he-said-she-said" claim of a resident like those involving Reagan. *Id.*; *cf. Coleman*, 667 F.3d at 851 ("Where a proposed comparator violated the same rule as the plaintiff in an equivalent or more serious manner, courts should not demand strict factual parallels.").  But instead of terminating the female CNA Hale (like was done with the male Reagan), Brannan determined that she merely "needed [to be] re-educated on speaking appropriately to residents," required her to complete a "post test" following review of the Abuse Policy, and suspended her for a total of four days. *Id.* at 2.  This, of course, all followed an earlier complaint against CNA Hale for resident abuse, albeit one that was ultimately discredited.

True, Chosen Healthcare received four accusations of abuse against Reagan in rapid succession. But, as described more in depth below, the circumstances surrounding those allegations were, at the very least, suspicious (or worse) according to Brannan (*see* Filing No. 36-6 at 1 (Brannan writing in an email that "[t]he allegations being made to surveyors are from smokers who have had their privileges reduced," and that "the smokers are out to get [Reagan] because they don't like him")). In any event, Chosen Healthcare's Abuse Policy does not differentiate discipline based on the timing or numerosity of allegations; instead, it instructs that "*all* alleged violations involving mistreatment, neglect, or abuse" will be reported and investigated (Filing No. 33-3 at 4–5) (emphasis added), and Chosen Healthcare's policies state that "[r]esident abuse"—a "prohibited behavior[ ]"—"will not be tolerated, *at any time*." (Filing No. 33-4 at 1) (emphasis added).  In other words, all instances of resident abuse are considered "of comparable

seriousness." *Coleman*, 667 F.3d at 851. As Chosen Healthcare itself recognized in its briefing, "[t]he Abuse Policy does not dictate what action must be taken if an alleged violation cannot be substantiated beyond the residents' own statements, nor does it prohibit discipline or termination for such violations." ([Filing No. 44 at 16](.).)

Accordingly, Reagan has put forth enough facts to establish a prima facie case by demonstrating that he was meeting Chosen Healthcare's legitimate expectations and that Chosen Healthcare treated (at least) CNA Hale more favorably after she engaged in conduct of comparable seriousness. *See Igasaki*, 988 F.3d at 957.

**B.   Pretext**

Chosen Healthcare also contends that it has "provided legitimate, nondiscriminatory reasons for discharging" Reagan: "it believed he violated its Abuse Policy after several residents accused [Reagan] of abuse." ([Filing No. 33 at 11](–12 (citing *Billups v. Methodist Hoss. of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991) ("There is little doubt that the defendant's articulated reason is legitimate. Physically abusing an elderly patient is serious misconduct.")).)  Relatedly, Chosen Healthcare contends that Reagan cannot prove any reason for terminating him was pretextual. *Id.* at 12.  "It is not enough," Chosen Healthcare contends, for Reagan "to allege merely that the acts for which he was terminated did not occur." *Id.* (citing *Billups*, 922 F.2d at 1304). According to Chosen Healthcare, the only relevant question is whether it "honestly believed the reasons it has offered to explain the discharge." *Id.* (citing *Billups*, 922 F.2d at 1304). Here, Reagan does "not dispute that residents accused him of abuse," and his "allegation that Chosen Healthcare 'used' the resident abuse accusations to terminate his employment is based on pure speculation." *Id.* at 12–13.

Reagan responds that "the four unsubstantiated allegations of abuse, alleged by three residents during a State Audit, who were known to dislike Reagan, whose allegations were

16

discredited by multiple sources, and where the ultimate decision was made by individuals with a discriminatory animus towards Reagan, should be viewed as pretext for discrimination." (Filing No. 35 at 25-26.)  Moreover, Reagan contends that the "cat's paw" theory applies—that is, that a subordinate controlled a decisionmaker's determination—when Brannan, "along with assistance from Gray and Wells, made the decision to terminate Reagan and Chosen [Healthcare] is attempting to rely on Mace, Schippers, and Hornstein in an attempt to weaken Reagan's claims." *Id.* at 26.  Specifically, Reagan contends that Brannan "did not like [him] following his gender discrimination complaint in 2017" and that Gray and Wells did not like him because of "his gender, age, and position of control (i.e. did not have to listen to their demands)."  *Id.* at 27.

Reagan continues that his "male voice" was designated as "an issue" on three separate occasions: (1) in his yearly performance review ((Filing No. 36-18 at 1) (noting that his "male voice can sometimes be taken as yelling/arguing")), (2) to Board surveyors (Filing No. 36-3 at 5 (informing them that Thomas had "talked to" Reagan about his "loud voice")), and (3) in an email Brannan sent (Filing No. 36-19 at 1 (describing Reagan as having a "cocky mouth") (Filing No. 35 at 27).  Reagan contends that these "discriminatory opinions," paired with the outsized influence of Wells and Gray, Brannan's displeasure based on Reagan's earlier gender complaint, and the "State's [a]udit," led to his termination. *Id.*  In short, Chosen Healthcare's "reliance on [Mace, Schippers, and Hornstein] is not only wrong but attempts to mitigate the discriminatory animus held by multiple Chosen [Healthcare] employees that assisted in Reagan's termination."  *Id.* at 28.

Reagan goes on to argue that not all four complaints were used in the employment decision, noting that Brannan recommended termination "prior to any of the complaints being substantiated, and especially prior to any investigation being undertaken" for two of the complaints. *Id.* at 28–29. Additionally, Reagan notes that he had no history of resident abuse: "During his prior

employment with Chosen [Healthcare] and again during his most recent employment, his background showed no history of abuse." *Id.* at 29. In contrast, CNA Hale "had three allegations of abuse on three different occasions." *Id.* As for LPN Cain, "she was only 're-educated' with no mark of discipline on her record." *Id.* For her part, RN Mooday "was permitted to leave with no discipline after a substantiated allegation." *Id.* Finally, Chosen Healthcare "went out of [its] way not to discipline [LPN Hilker] under the abuse policy." *Id.* at 29–30.

Reagan also argues that Chosen Healthcare "is attempting to distort [its] own policy and argue that the allegations were made (i.e. substantiated) and therefore [it] 'honestly believed' Reagan engaged in abuse." *Id.* at 30 (citing *Odhuno v. Reed's Cove Health & Rehab., LLC*, 355 F. Supp. 3d 1026 (D. Kan. 2018)). The Court, Reagan maintains, should find this "argument disingenuous." *Id.* In any event, Chosen Healthcare's "reliance on 'unsubstantiated' allegations of abuse cannot be found to be a legitimate, non-discriminatory basis. Rather, [its] reliance on 'unsubstantiated' allegations goes against what any reasonable fact finder would do. Residents that were known to dislike Reagan alleged the allegations, which were found to be unsubstantiated by both the" Board and Chosen Healthcare. *Id.* at 30–31. Moreover, because "[f]ailure to report allegations of abuse/neglect is equal to actual abuse/neglect" under the Abuse Policy, LPN Cain—like Reagan—should "have been terminated for failing to report." *Id.* at 31.

Reagan argues that "[i]t appears to be common practice in this industry to permit CNAs accused of abuse the option to resign in order to avoid discipline." *Id.* at 31 (collecting cases). Because of this practice, Reagan could not "develop[ ] an overwhelming record of female CNAs who were not terminated after allegations of abuse to more clearly demonstrate the discriminatory treatment." *Id.* at 32. As argued above, Chosen Healthcare "has shown a pattern of not reporting abuse and a pattern of not disciplining female employees in the same fashion as males." *Id.*

18

Reagan concludes that Chosen Healthcare's "policy notes that only if the allegations are 'substantiated' will, '[a]ppropriate corrective action be taken." *Id.*  This ambiguity, concerning what takes place when allegations are *unsubstantiated*, "permits Chosen to discriminately apply their policy." *Id.* at 33.  As evidenced by the treatment of female employees compared to Reagan, Chosen Healthcare "refuses to adhere to [its] own policies and, as a result, hid or manipulated evidence to suggest that other instances of abuse and neglect have not occurred, when, in reality, they have occurred and instead [have] been given another name." *Id.*

In reply, Chosen Healthcare argues that it "has articulated a legitimate, nondiscriminatory reason for [Reagan]'s termination, resident abuse." ([Filing No. 44 at 19](.).) It asserts "undisputed evidence shows that all four resident abuse allegations against [Reagan] could not be substantiated **beyond the resident**." *Id.* (emphasis in original).  Indeed, Reagan "agreed that [Chosen Healthcare] may ultimately believe a resident over an employee and choosing to believe a resident's word is not discriminatory." *Id.* Discrimination cannot be inferred when "Chosen Healthcare chose not to take the risk of continuing to employ someone who multiple residents accused of abuse." *Id.*

As for Reagan's cat's paw theory—that Brannan, Gray, and Wells controlled the decisionmakers into terminating him—Chosen Health argues that Reagan has provided no requisite underlying evidence of subordinate animus.  *Id.* (citing *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)).  First, Reagan only relies on his own testimony to support that Brannan did not like him following a 2017 complaint concerning gender discrimination, yet "it is unclear how this is evidence of discriminatory animus against individuals because of their gender." *Id.* at 20.  As for Gray and Wells, Reagan again "only points to his subjective beliefs about [their] motives and intentions." *Id.*  Chosen Healthcare concludes that Reagan's "cat's paw theory fails as

he cannot even meet the first requirement of showing the alleged biased subordinate harbored discriminatory animus, much less that it was the proximate cause for his termination." *Id.*

Though Chosen Healthcare has articulated a legitimate, nondiscriminatory reason for his termination—that is, that they acted as a result of resident abuse allegations—Reagan has shown that this proffered explanation is a pretext.

> To show this reason is pretextual, [a plaintiff] must present evidence suggesting that the employer is dissembling. The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge. It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.
>
> To meet this burden, [a plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [a defendant's] asserted reason that a reasonable person could find [it] unworthy of credence. . . . [I]f the stated reason, even if actually present to the mind of the employer, wasn't what induced him to take the challenged employment action, it was a pretext.

*Coleman*, 667 F.3d at 852–53 (quotations omitted). In his effort to defeat summary judgment, Reagan does, as Chosen Healthcare notes, lean heavily upon his own unsupported, conclusory deposition testimony. *See Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (noting "that the evidence supporting a factual assertion must represent admissible evidence. Conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment.  Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter; rather, it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted") (quotations and citations omitted).

But that is not all the evidence he musters.  Apart from explicit references to Reagan's gender in regard to his performance by Thomas in a performance review (*see* Filing No. 36-18 at 1), in a pre-termination email that included Hornstein, Brannan explained that "[t]he allegations being made to surveyors are from smokers who have had their privileges reduced," and that "the

smokers are out to get [Reagan] because they don't like him." (Filing No. 36-6 at 1.) With these statements, Brannan outwardly admits that he does not believe the complaints against Reagan to be true; rather, he supposes they were ginned up by residents to exact revenge upon the tobacco-policy-enforcing Reagan (who, recall, maintains he was picked for this role because he was a man). Though Brannan may not have had decision-making power as to Reagan's continued employment, he apprised Hornstein—a decisionmaker—of his leery views about the complaints. A jury could view this communication as undermining Chosen Healthcare's contention that the decision to terminate Reagan's employment was sincerely predicated upon the abuse allegations, as it tends to show incredulity toward their veracity: did Chosen Healthcare "honestly believe" its reason for terminating Reagan? With evidence that Hornstein directly received this message, the Court need not even resort to any cat's paw inquiry to answer that question. Thus, Reagan has identified "such weaknesses, implausibilities, inconsistencies, or contradictions in [Chosen Healthcare's] asserted reason that a reasonable person could find [it] unworthy of credence." *Coleman*, 667 F.3d at 852.

Moreover, "[w]here the plaintiff argues that an employer's discipline is meted out in an uneven manner, the similarly-situated inquiry dovetails with the pretext question. Evidence that the employer selectively enforced a company policy against one gender but not the other would go to both the fourth prong of the prima facie case and the pretext analysis." *Id.* at 858.[4] Here, as explained above, Reagan has provided adequate evidence to show that Chosen Healthcare "meted out" discipline in an uneven manner, considering the differing treatment between Reagan and CNA Hale following similar allegations of resident abuse. All told, when asked "whether the employer

---

[4] This blurring, of course, underscores the Seventh Circuit's explanation that, despite *McDonnell Douglas*' helpful framework, the sole "determinative question in discrimination cases is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki*, 988 F.3d at 958 (quoting *Ortiz*, 834 F.3d at 765). Here, the answer is yes. *See Ortiz*, 834 F.3d at 764 (7th Cir. 2016) ("All evidence should be considered together to understand the pattern it reveals.").

honestly believed the reasons it has offered to explain the discharge," *id.*, a reasonable jury, armed with the evidence provided by Reagan, could answer no.  Because Reagan has provided sufficient evidence to create a genuine issue of fact as to whether Chosen Healthcare's asserted reason for terminating him was pretextual, this case's resolution is not suited for summary judgment.

## IV.      CONCLUSION

For the reasons discussed above, the Court **DENIES** Chosen Healthcare's Motion for Summary Judgment (Filing No. 32).

**SO ORDERED.**

Date:  9/13/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC (Indianapolis)
ad@bdlegal.com

Taylor Jon Ferguson
BIESECKER DUTKANYCH & MACER LLC (Indianapolis)
tferguson@bdlegal.com

Donald E. English, Jr.
JACKSON LEWIS P.C.
donald.english@jacksonlewis.com

Mary M. McCudden
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, MD 21209

Robert F. Seidler
JACKSON LEWIS PC (Indianapolis)
robert.seidler@jacksonlewis.com